**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:09-cr-00476 JLT |
| Plaintiff, | ORDER DENYING MOTION FOR A SENTENCE REDUCTION |
| v. | (Doc. 60) |
| KENYON GRAHAM REYNOLDS, | |
| Defendant. | |

Kenyon Graham Reynolds moves for a reduction in his sentence, to time served, under 18 U.S.C. § 3582(c)(1)(A). Although his circumstances are extraordinary and offer compelling reasons to consider a reduction, he has not demonstrated that a sentence of time served would be appropriate under the factors listed in 18 U.S.C. § 3553(a). The motion is **DENIED**.

**BACKGROUND**

Reynolds was indicted on three charges in this case: sexual exploitation of a minor, receipt of material involving the sexual exploitation of minors, and commission of a felony offense involving a minor while registered as a sex offender. (Doc. 1 at 1–3.) He agreed to plead guilty to the second count, for receipt. (Doc. 26 at 2.) He admitted that he had "used a computer and modem to access the internet and obtain" more than three hundred pictures "of minors engaged in sexually explicit conduct." (*Id.* at 7.) The government agreed to dismiss the other two charges if Reynolds was sentenced under the terms of the plea agreement. (*Id.* at 2.) Among other things,

1

that agreement recommended a 300-month sentence and a lifetime term of supervised release under Federal Rule of Criminal Procedure 11(c)(1)(C).  (*See id.* at 4–5.)

The guidelines range for Reynolds's sentence was 210 to 262 months' imprisonment, but the Court sentenced Reynolds to the higher 300-month term, followed by a lifetime term of supervised release, as the parties recommended.  (*See* PSR at 20; Doc. 56.)  Reynolds began serving that sentence in 2011.  (*See* Doc. 60-3 at 2.)

About two years after Reynolds began serving his sentence, he was on a break from his food service job when another inmate approached him and began to argue with him.  (Doc. 60-2 at 6–8.)  This other man was the "number one cook," the man with the highest seniority and rank in the prison's kitchen where Reynolds worked.  (*See id.*)  After a few minutes, he hit Reynolds on the ear, knocked him unconscious, and began kicking him in the head, eventually leaving him in a "heap on the floor."  (*See* Docs 60-2 at 8; 60-4 at 2.)  Reynolds was evacuated by helicopter to a hospital, where he was treated as an inpatient for three days.  (Doc. 60-2 at 8–9.)  The attack left him with head and jaw injuries and symptoms that remain with him to this day, including severe headaches, nerve damage, and permanent dizziness.  (*See* Docs. 60-2 at 8, 14; 60-3 at 2.)  He uses a cane or walker and has fallen at least once, leading to pain and numbness.  (*See* Doc. 62 at 13.)

Reynolds pursued damages for his injuries in a lawsuit under the Federal Tort Claims Act.  The case went to trial before the judge, without a jury.  *See* Findings of Fact & Conclusions of Law, *Reynolds v. United States*, No. 15-262 (S.D. Ill. Nov. 20, 2019).[1]  The court found that although the attack was "horrible, no question," and had left Reynolds with "terrible" injuries that would stay with him "for the rest of his life," neither the Bureau of Prisons nor any individual guard was to blame, so Reynolds could not recover damages.  (Doc. 60-2 at 14.)

As an aside, it is unclear from the court's findings of fact and conclusions of law whether the evidence established the motives behind the attack.  Members of the prison's staff were not aware of any "friction" between the two men, and Reynolds had never mentioned any concerns.

[1] A copy of the district court's findings of fact and conclusions of are available on the docket of this action at Doc. 60-2.

(*See id.* at 5–7.)  The court's description of their argument and the attack does not include any details about their dispute, Reynold's conviction, or his status as a sex offender.  (*See id.* at 5–8.) If anything, the circumstances seemed to suggest that staff and inmates had managed to avoid or prevent violence against Reynolds and other sex offenders.  The facility had a sex offender treatment program, and a substantial portion of the inmates who lived there were sex offenders. (*See id.* at 3–4.)  And although staff members and inmates "were apprehensive at first about the enhanced dangers" that might come along with a large population of inmates with sex offenses, "the situation was working well" at the time of the attack.  (*Id.* at 4.)

Reynolds has now completed about fifteen years of the total twenty-five.  (*See id.* at 3.) The BOP's records show that he will be eligible for home detention in February 2032 and for release in August 2032.  (*See id.* at 2.)  He moves to reduce his sentence to time served under 18 U.S.C. § 3582, represented by counsel.  (Doc. 60.)  His motion is based on a combination of several circumstances:

- The long-term effects of the 2013 attack continue to compromise his health.  He suffers from chronic headaches, nerve damage, and dizziness.  (*See* Doc. 60 at 7– 8.)  The attack also left him with symptoms of post-traumatic stress disorder.  (*See id.* at 12.)  By contrast, before his incarceration, Reynolds said that he was "healthy" and had "no history of health problems," setting aside a diagnosis of anxiety disorder and depression.  (PSR at 13.)
- Reynolds is currently 61 years old and suffers from a variety of other health problems that are related to his age at least in part, including pain in his back, hip, elbow, jaw, and ear; high blood pressure; asthma; peripheral neuropathy; and preglaucoma.  (*See* Docs. 60 at 9; 64 at 2–10.)
- Reynolds has no records of any prison discipline, he has earned more than 750 days of good-time credits, he has a good work history in recycling electronics, and has successfully completed more than 500 hours of "evidence based recidivism reduction program credits."  (Docs. 60 at 10–11; 60-3 at 2–6.)  This history has led to a "minimum" risk score.  (Doc. 60-3 at 7.)

3

- If released, Reynolds intends to seek medical and mental health care from the Veteran's Administration (he enlisted in the United States Navy in 1987 and was honorably discharged in 1989) and to help care for his aging father, who suffers from dementia and mobility problems and lives far from other members of the family. (*See* Docs. 60-4 at 2; 60-5 at 2; PSR at 14.) Reynolds's sister agrees it "would be of great benefit to [the] family if [Reynolds] could be released early so that he can care for [their] father." (Doc. 60-5 at 2.)

- Reynolds is no longer housed in the facility where he was attacked, but he remains concerned about the risks he faces as an incarcerated sex offender. (*See* Docs. 60 at 10; 60-4 at 3.) Until recently, he was incarcerated at FCI Terminal Island in Los Angeles County, California. (Doc. 60-3 at 2.) The Bureau of Prisons reports on its website that no inmates are currently housed within FCI Terminal Island.[2] Its inmate locator states that Reynolds is currently housed in FCI Lompoc I, in Santa Barbara County, California.[3] Reynolds does not say whether he faces any particular risks in that facility; his concerns focused initially on a different facility. (*See* Doc. 60-4 at 3.)

The government opposes the motion. (Doc. 67.) It argues first that if Reynold's sentence is reduced at his request, then he will be in breach of his plea agreement. (*Id.* at 5–6.) Second, the government argues that Reynolds's circumstances are not so "extraordinary and compelling" that they could warrant a reduction in his sentence. (*See id.* at 6–9.) Third, the government argues that the relevant sentencing factors do not favor a reduction. It relies primarily on the seriousness of his offense and the need to protect the public from future crimes. (*See id.* at 9–11 & n.2.)

Reynolds has filed a reply with the assistance of counsel. (Doc. 72.) He argues that he

---

[2] *See* https://www.bop.gov/locations/institutions/trm/. The Court takes judicial notice of this fact. *United States v. Thornton*, 511 F.3d 1221, 1229 n.5 (9th Cir. 2008) (taking judicial notice of publicly available information provided by the BOP).

[3] *See* https://www.bop.gov/inmateloc/; https://www.bop.gov/locations/institutions/lof/. The Court takes judicial notice of this fact. *See Hernandez-Velasquez v. Warden, FCI-Mendota*, No. 24-0130, 2024 WL 3363224, at *1 n.2 (E.D. Cal. July 8, 2024) (discussing relevant standards and legal authority).

4

did not waive his right to pursue relief under § 3582(c)(1)(A) in his plea agreement, but he does not respond specifically to the government's argument that he may be in breach of his plea agreement if his motion is granted. (*See id.* at 2–3.)  Next, he faults the government for taking his arguments about his circumstances one by one, rather than on the whole, as he has presented them. (*See id.* at 3–4.)  Finally, he contends that the relevant sentencing factors favor his release, citing his "age, serious medical conditions, and sincere efforts at rehabilitation." (*Id.* at 5.)  He argues that he now poses "little or no risk of danger to the community should he be released to supervision of the probation office." (*Id.* at 5.)  The Court took the matter under submission without hearing oral arguments.

## PLEA AGREEMENT

To understand the government's arguments about Reynolds's plea agreement, it is first necessary to explain a few additional details about the investigation that eventually led to Reynolds's conviction.

The government claims in its opposition brief—and Reynolds does not contend otherwise in reply—that when officers arrested him in 2007, they found not only photos, but also a video. (Doc. 67 at 2.)  Reynolds admitted to the officers that he had secretly recorded this video himself. (*Id.* at 2–3).  It showed him at home with his unclothed seven-year-old stepdaughter as he dried her off after a bath.  (*Id.*)  When officers later interviewed Reynolds about the video, he admitted that he had hugged his stepdaughter, that his penis had been erect at the time, and that the video of this interaction was sexually arousing to him. (*See id.* at 3–4.)  Officers spoke with his stepdaughter. (*See id.* at 3.)  She told them that he had sometimes massaged or squeezed her bottom. (*Id.*)

The presentence investigation report includes a similar description of Reynolds's conduct. (*See* PSR at 4–6.)  He objected to some portions of that report, but not to its description of the arrest, his admissions to the officers, the contents of the disk, or his interactions with his step-daughter. (*See* Doc. 29).  In fact, that disk and its contents were the subject of a state-law conviction, which resulted in a thirty-six month prison sentence that Reynolds served concurrently with his longer federal sentence. (*See* PSR at 10–11.)  In short, Reynolds does not

dispute that he both received images depicting the sexual abuse of children and created a video that at least arguably depicts his own abuse of a child.

The video is relevant now because the government could likely rely on it to support the charges that were dismissed as part of the plea agreement, i.e., for sexual exploitation of a minor and for commission of a felony offense involving a minor while registered as a sex offender. (*See* Docs. 1 at 1–3; 26 at 4–5.) In fact, according to the government, Reynolds agreed to an above-guidelines 300-month sentence specifically to avoid the even longer 420-month sentence that would have been mandatory if he had been convicted under the two dismissed charges. (*See* Doc. 67 at 5–6.) The Probation Office took a similar view of the plea agreement's effects. (*See* PSR at 16 ("[H]ad the defendant been convicted of the additional offenses alleged in the Indictment, he would have faced a mandatory minimum sentence of 35 years' imprisonment.").)

An advantageous plea is only the first part of the story. The government contends in addition that the plea agreement includes language that would permit the U.S. Attorney's Office to revive all three charges again—and thus seek the longer 420 total sentence—if his 300-month sentence is reduced at his request. (*See* Doc. 67 at 6.) It relies on the following passage:

> Defendant knowingly and voluntarily waives his Constitutional and statutory rights to appeal his plea, conviction, and sentence. . . . The defendant further agrees not to contest his plea, conviction, or sentence (including any term of supervised release) in any post-conviction proceeding, including but not limited to a proceeding under 28 U.S.C. § 2255. . . .
>
> The defendant agrees that one component of an overall "reasonable sentence" will be a term of federal imprisonment of 300 months. He will not request a sentence of imprisonment lower than 300 months by way of a request for a downward departure in offense level or criminal history category, by reference to sentencing factors under 18 U.S.C. § 3553(a), challenge to a mandatory minimum prison term, or any other means. . . .
>
> If the defendant's conviction on the count to which he is pleading is ever vacated at the defendant's request, or his sentence is ever reduced at his request, the government shall have the following rights: (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed under this agreement; and (3) to file any new charges that would otherwise be barred by this agreement. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office. By signing this agreement, the defendant agrees to waive any objections, motions, and defenses he might have to the

6

> government's decision, including Double Jeopardy. In particular, he agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

(Doc. 26 at 5–6.)

To be clear, the government does not argue that Reynolds *waived* his right to request a reduction under § 3582(c)(1)(A).  That argument would not be persuasive in any event.  The language the parties used to describe their agreement refers to the conviction and sentence as originally imposed and to the appropriateness of that sentence at the time.  It does not refer to events that might occur later, after he began to serve that sentence.  *See United States v. Akel*, 388 F. Supp. 3d 1248, 1251–53 (D. Nev. 2019).  In fact, only the Bureau of Prisons could request a sentence reduction based on "extraordinary and compelling reasons" at the time.  *See, e.g.*, *Rutherford v. United States*, ___U.S. ___, No. 24–820, 2026 WL 1485535, at *4 (U.S. May 28, 2026) (citing amendments passed as part of the First Step Act of 2018).  It is difficult to see how Reynolds could have agreed to waive a right that he did not possess.

Rather than a waiver, the government argues essentially that Reynolds agreed to accepted the risk of a new prosecution if he later requested and received a reduction in his sentence.  (*See* Doc. 67 at 6 (arguing Reynolds's motion "place[s] him at risk of the government seeking a new indictment that would allege the same offenses in the first indictment.").)  Although the government made this point unambiguously in its opposition brief, Reynolds did not address it in his reply.  (*See* Doc. 72 at 2–3.)

The Supreme Court has emphasized in recent years that the federal judicial system is adversarial, not inquisitorial.  *See, e.g.*, *Margolin v. Nat'l Ass'n of Immigr. Judges*, ___ U.S. ___, No. 25–767, 2026 WL 1463466, at *2 (U.S. May 26, 2026) (per curiam) (citing *Clark v. Sweeney*, 607 U.S. 7, 8 (2025) (per curiam)).  It is a system for resolving "cases" and "controversies," not for weighing the contingencies of "future events that may not occur as anticipated, or indeed may not occur at all."  *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  Federal courts resolve the disputes that the parties present.  *See Clark*, 607 U.S. at 8.  They do not offer opinions about issues that are not "ripe" for review.  *Trump*, 592

U.S. at 131.

The possibility of a new indictment and new charges against Reynolds is just that: a possibility. And if that possibility does eventually materialize, the legal issue is likely to be both sensitive and difficult to resolve. Only rarely do federal courts exercise judicial power over a prosecutor's "decision whether or not to prosecute, and what charge to file or bring." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). To complicate matters further, the parties cite no cases in which any court has decided whether a defendant who obtains a sentencing reduction under § 3582(c)(1)(A) can for that reason be subjected to a renewed prosecution based on the terms of a similar plea agreement. The Court is aware of none, even though it appears that the same or similar language has often appeared in plea agreements in cases in this District. *See, e.g.*, *United States v. Chaney*, 581 F.3d 1123, 1124 & n.1 (9th Cir. 2009); *United States v. Wilson*, No. 15-000464, 2022 WL 17904539, at *4 & n.3 (E.D. Cal. Dec. 23, 2022); *Ali v. United States*, No. 08-396, 2009 WL 3698511, at *1 (E.D. Cal. Nov. 4, 2009); *Nelson v. United States*, No. 07-0134, 2009 WL 361954, at *2 (E.D. Cal. Feb. 12, 2009); *Magana v. United States*, No. 06-158, 2008 WL 4367585, at *1 (E.D. Cal. Sept. 23, 2008); *Orozco v. United States*, No. 06-023, 2007 WL 4463124, at *1 (E.D. Cal. Dec. 17, 2007); *United States v. Sawyer*, No. 02-0468, 2006 WL 2032581, at *1, 3 (E.D. Cal. July 18, 2006).

In short, the Court cannot decide now whether prosecutors could pursue any new or revived charges against Reynolds based on the results of his current motion. The Court does not reach that issue.

## SENTENCING REDUCTION

Federal law allows a district court to reduce a prison sentence "after considering the factors set forth in section 3553(a) to the extent that they are applicable," but only if the defendant has first requested a reduction from the Bureau of Prisons, and only if the court also finds both that "extraordinary and compelling reasons warrant such as reduction" and the reduction "is consistent with applicable policy statements by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). It is the defendant's burden to "establish his eligibility" for a reduction under

this statute. *United States v. Wright*, 46 F.4th 938, 951 (9th Cir. 2022).

Reynolds presented his request to the Bureau of Prisons before he filed this motion (Doc. 67 at 5 n.1), so his motion raises only two questions: first, whether extraordinary and compelling reasons warrant a release in light of the Sentencing Commission's relevant policy statements, and second, whether a reduction is appropriate under the factors listed in § 3553(a).

**A.    Extraordinary and Compelling Reasons**

The Sentencing Commission's policy statement on extraordinary and compelling reasons is the best place to begin.  It is found in section 1B1.13(b).  Four portions of that policy statement are relevant.

First, a defendant's medical condition may warrant a reduction.  The Sentencing Commission listed three specific situations in its policy statement:

> The defendant is—
>
> (i) suffering from a serious physical or medical condition,
>
> (ii) suffering from a serious functional or cognitive impairment, or
>
> (iii) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13(b)(1)(B).  A medical condition might also be an extraordinary and compelling reason for a reduction if it "requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death. *Id.* § 1B1.13(b)(1)(C).

Second, independently of any particular medical condition, a defendant's age might justify a reduction if the defendant "(A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." *Id.* § 1B1.13(b)(2).

Third, a defendant's family circumstances might be an extraordinary and compelling reason to reduce his sentence. *See id.* § 1B1.13(b)(3).  For example, "[t]he incapacitation of the

defendant's parent" might justify a reduction if "the defendant would be the only available caregiver for the parent."  *Id.* § 1B1.13(b)(3)(C).

Fourth, a reduction might be warranted if the defendant was the victim of physical or sexual abuse.  *See id.* § 1B1.13(b)(4).  For example, if the defendant was a victim of "physical abuse resulting in 'serious bodily injury,'" while in custody, then the abuse might be an extraordinary and compelling reason if it "was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant."  *Id.* § 1B1.13(b)(4)(B).  The phrase "serious bodily injury" means "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  *Id.* § 1B1.1 (Application Instructions).

It is not necessary to decide whether Reynolds's circumstances would meet any one of these four requirements if taken in isolation.  That is because a "combination of circumstances" might warrant a reduction when it is "similar in gravity" to those the Sentencing Commission identified specifically.  *Id.* § 1B1.13(b)(5).  In addition, a defendant's rehabilitation "may be considered in combination" with the broader circumstances, although "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason."  *Id.* § 1B1.13(d) (citing 28 U.S.C. § 994(t)).

Reynolds has demonstrated that the combination of his medical condition, age, family circumstances, and his assault at the hands of another inmate are "similar in gravity" to the circumstances that the Sentencing Commission listed in paragraphs (1) through (4) of subsection (b), and he has further supported his position by offering evidence of his rehabilitation under section (d):

- With respect to subsection (b)(1), Reynolds's medical records show he is suffering from serious, longstanding health problems that cause chronic pain, make him dizzy, make it difficult for him to walk, and are unlikely to be fully resolved or cured.  (*See* Docs. 60 at 7–9, 12; 64 at 2–10.)
- With respect to subsection (b)(2), Reynolds is younger than 65, but he is in his

early sixties, and he is experiencing a deterioration in his physical health that is likely the result of the aging process, at least in part. (*See* Docs. 60 at 9; 64 at 2–10.) Reynolds has also served more than ten years of his sentence.

- With respect to subsection (b)(3), Reynolds and his sister believe that he could help care for his aging father, who is suffering from dementia, has mobility problems, and lives far away from other family members. (*See* Docs. 60-4 at 2; 60-5 at 2.)

- With respect to subsection (b)(4), Reynolds suffered serious injuries at the hands of the "number one cook," an inmate with the highest seniority and rank in the prison kitchen where Reynolds worked at the time. (*See* Docs. 60-2 at 6–9; 60-3 at 2; 60-4 at 2; 62 at 13.)

- With respect to subsection (d), Reynolds has no records of any prison discipline, he has worked productively in prison, and he has completed several hundred hours of "evidence based recidivism reduction program credits." (*See* Docs. 60 at 10–11; 60-3 at 2–6.)

Reynolds's circumstances are also "extraordinary" and "compelling" on their own terms, in that they are "especially unusual and convincing." *Rutherford*, 2026 WL 1485535, at *7. Courts have found similar combinations of circumstances were extraordinary and compelling in many other cases. *See, e.g.*, *United States v. Collamore*, No. 10-00158, 2025 WL 1475603, at *5–8 (D. Me. May 22, 2025) (finding combination of a need for specialized treatment, age-related health problems, lengthy sentence, and a lack of discipline were extraordinary and compelling reasons); *United States v. Jackson*, No. 06-00134, 2025 WL 1255131, at *4–12 (E.D. Cal. Mar. 31, 2025) (finding combination of medical conditions, sentence length, age-related conditions, rehabilitation, and other factors created extraordinary and compelling reasons for a reduction); *United States v. Cheng*, No. 21-261, 2025 WL 573767, at *3–4 (S.D.N.Y. Feb. 21, 2025) (finding combination of violent attack, medical problems, harsh conditions of confinement, and absence of discipline created extraordinary and compelling reasons); *United States v. Morales*, No. 16-00241, 2024 WL 967658, at *3–5 (E.D. Cal. Mar. 6, 2024) (finding combination of personal

health risks, other medical conditions, and sexual assault in prison were extraordinary and compelling reasons).

The Court does not find, however, that the possibility of a future attack or assault is an extraordinary or compelling reason warranting a reduction under the Sentencing Commission's relevant policy statements. It has been many years since Reynolds was attacked, he has not cited any intervening attacks or threats, and he has not explained how his current housing puts him in any particular risk.

### B.    Sentencing Factors

A defendant who offers extraordinary and compelling reasons for a sentence reduction cannot receive that reduction without also showing that the reduced sentence is appropriate under the factors listed in § 3553(a). Reynolds and the government have focused on the following provisions within § 3553(a):

- The "nature and circumstances of the offense." *See* 18 U.S.C. § 3553(a)(1).
- The defendant's "history and characteristics." *See id.*
- The need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *See id.* § 3553(a)(2)(A).
- The need "to afford adequate deterrence to criminal conduct." *See id.* § 3553(a)(2)(B).
- The need "to protect the public from further crimes of the defendant." *See id.* § 3553(a)(2)(C).

The fifteen years that Reynolds has served to date make for a long sentence, even for the possession of images depicting the sexual abuse of children. *See, e.g.*, U.S. Sent. Comm'n, "Federal Sentencing of Child Pornography: Non-Production Offenses 20–21 (July 2021) (showing average sentence lengths of about 96 months for "receipt" offenses for the 2019 fiscal year). But the guidelines range for Reynolds's conduct was longer than fifteen years. (*See* PSR at 20.) The broader circumstances of Reynolds's offense also include more than just the receipt of images. Reynolds does not dispute the government's assertion that he recorded and kept a

12

video of himself with his young stepdaughter, which depicted the two of them in extremely disturbing circumstances.  His actions show that he was willing not only to receive images, but worse, to abuse a child's trust and to record his conduct on video, ostensibly for his own later consumption.  His stepdaughter's statement to police that he had touched her in potentially inappropriate ways at other times is more concerning still.  It suggests other conduct beyond the conduct at the basis of his current conviction.

As for deterrence, it is always difficult to know whether a particular sentence affords "adequate deterrence" for a given crime.  The prospect of spending fifteen years in a federal prison is likely to be a powerful deterrent, all else equal.  But at the same time, it is difficult to say whether the potential for a lengthy prison sentence is an adequate deterrent in this case.  When officers caught Reynolds with the images and video that led to his conviction in this case, he had already been convicted of a crime under state law that had obligated him to register as a sex offender.

The Sentencing Commission has investigated recidivism among defendants who have been convicted of offenses related to the possession of child pornography.  More than 72% of all defendants who have been convicted of a "non-production" offense are not arrested again.  Non-Production Offenses, *supra*, at 65.  Of those who are arrested again, fewer are arrested for sexual offenses than for other types of offenses.  *See id.*  Only a small fraction of the total, about four percent, were arrested for sexual offenses after their release.  *See id.*

Reynolds argues in a similar vein that his continued incarceration is not necessary to protect the public from future crimes, citing his age and health conditions.  (*See* Docs. 60 at 12; 72 at 5.)  This argument is difficult to assess.  It is true that defendants older than 50 are, on the whole, less likely to be arrested after release than younger defendants.  *See* U.S. Sent. Comm'n, "Older Offenders in the Federal System" at 42–43 (July 2022).  When defendants older than 50 are arrested again after their release, it also generally for "less serious crimes" than defendants who are younger than 50.  *Id.* at 44.  But the picture is more complicated for some categories of arrests, including arrests for sexual assault, other sex offenses, and parole or supervised release violations.  *See id.*  Older defendants are more likely than younger defendants to be arrested again

for offenses in those categories. *See id.* Beyond these recidivism statistics, defendants older than 50 are also, in general, more likely than others to face charges related to child pornography, sexual abuse, and other sex offenses. *See id.* at 24. To put the issue bluntly: even an older, infirm man could obtain images of child abuse from the internet after his release from custody.

The Court has also reviewed the declaration Reynolds submitted with his motion. He acknowledges that his offense was "not a victimless crime and impacted many individuals including [his] family." (Doc. 60-4 at 2.) He states that it is his plan to use "all the resources available to [him], including employing [himself] with the skills [he] obtained at [an] electronic recycling center," and he plans to "give back to the community by finding ways to encourage others to reach out for help with addictive behaviors." (*Id.*) As noted, he also plans to seek counseling from the Department of Veterans Affairs. (*Id.*)

Although it is a closer case than many others, the Court cannot conclude on this record that a reduction to time served would be appropriate under the relevant factors. Reynolds's offense conduct was not violent, but it was harmful and dangerous in its own very serious way. His history and characteristics also show that he had struggled for many years to avoid the types of actions that ultimately led to his conviction, even though he had registered as a sex offender based on a previous state-law conviction. Finally, Reynolds's explanation of his post-release plans are too generic to offer strong reassurances that he will obtain the support he needs to avoid a repeat offense. For example, it is good for him to plan to look for help from the Department of Veterans Affairs, but it is unclear what services he plans to request, whether those services are available, where he could obtain them, and how he plans to get there. *See, e.g.*, *United States v. Peel*, No. 14-00192, 2020 WL 6820784, at *5 (E.D. Cal. Nov. 20, 2020) (denying similar motion based in part on "the unavailability of adequate transportation to required sex offender treatment," among other shortcomings in a release plan).

///

///

///

///

14

**CONCLUSION**

The motion for a sentence reduction (Doc. 60) is **DENIED**.

IT IS SO ORDERED.

Dated:    **June 12, 2026**

_____
UNITED STATES DISTRICT JUDGE

15